UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
KEVIN MOORE,

                                        Plaintiff,

            -against-

ANTHONY J. ANNUCCI, individually and in his official
capacity as Acting Commissioner of the New York State
Department of Corrections and Community Supervision,
ADA PEREZ, individually and in her official capacity as
Superintendent of Downstate Correctional Facility,
SERGEANT KATHY TODD-SCOTT, individually and in her
official capacity, CORRECTIONAL OFFICER GEORGE
SANTIAGO, individually and in his official capacity,
CORRECTIONAL OFFICER DONALD COSMAN,
individually and in his official capacity and CORRECTIONAL
OFFICER CARSON MORRIS, individually and in his official
capacity, PANDORA A. VOLPE RN-II, individually and in her
official capacity, DOWNSTATE CORRECTIONAL
FACILITY DEPUTY SUPERINTENDENT FOR SECURITY
JOHN/JANE DOE, individually and in his/her official capacity,
DOWNSTATE CORRECTIONAL FACILITY HEALTH
SERVICES DIRECTOR JOHN/JANE DOE, individually and in
his/her official capacity, JOHN/JANE DOE PHYSICIANS,
individually and in their official capacities, JOHN/JANE DOE
PHYSICIAN ASSISTANTS, individually and in their official
capacities, JOHN/JANE DOE NURSE ADMINISTRATORS,
individually and in their official capacities, JOHN/JANE DOE
NURSE PRACTITIONERS, individually and in their official
capacities, JOHN/JANE DOE NURSES, individually and in
their official capacities, and CORRECTIONAL OFFICERS
JOHN DOE 1-5, individually and in their official capacities,

                                        Defendants.

---------------------------------------------------------------------------X

Docket No.

**VERIFIED COMPLAINT**

Jury Trial Demanded

         Plaintiff, KEVIN MOORE, by his attorneys, HELD & HINES, LLP, as and for his

Verified Complaint, hereinafter states and alleges as follows upon information and belief:

## PRELIMINARY STATEMENT

1.      Plaintiff commences this action pursuant to 42 U.S.C. §1983 seeking compensatory and punitive damages against Defendants for violating his constitutional rights while acting under color of law, together with reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

2.      On or about November 12, 2013, the New York State Department of Corrections and Community Supervision ("DOCCS") transported Plaintiff, a prisoner confined to its custody and care, from Coxsackie Correctional Facility to Downstate Correctional Facility ("DCF") as he had a motion hearing the following day in New York County Criminal Court and was scheduled to be picked up on November 13, 2013 by officers of the New York City Department of Correction for transport to Court.

3.      Within minutes of Plaintiff being received by DCF, Defendants, Sergeant Kathy Todd-Scott ("Sgt. Scott"), Correctional Officer George Santiago ("C.O. Santiago"), Correctional Officer Donald Cosman ("C.O. Cosman"), Correctional Officer Carson Morris ("C.O. Morris"), and Correctional Officers John Doe 1-5 ("C.O. John Does"), in an unprovoked attack, used excessive physical force upon Plaintiff by body slamming, beating, stomping, kicking and punching him, by striking him with their batons, and by ripping a large portion of Plaintiff's dreadlocks out of his head. As a result of this excessive use of force, Plaintiff sustained a collapsed lung, multiple rib fractures, fractured orbit and cheek bone, internal injuries including fractures of the internal body wall, as well as other injuries and emotional trauma. Following this excessive use of force, Defendants were deliberately indifferent to Plaintiff's objectively serious and life-threatening medical condition such that they denied him access to timely and appropriate medical care.

4.      The subject incident was investigated by DOCCS' Inspector General's Office. On January 10, 2014, DOCCS suspended Sgt. Scott, C.O. Santiago, C.O. Cosman and C.O. Morris without pay,[1] and on January 17, 2014, separate Notices of Discipline were issued against each. Following a disciplinary arbitration hearing held over five (5) days in March and April 2014, by Decision dated September 15, 2014, the arbitrator found Sgt. Scott and C.O. Santiago culpable and held "[t]he proposed penalty of termination is appropriate" as to these defendants. With regard to C.O. Cosman and C.O. Morris, the arbitrator found these defendants culpable as well, but did not find termination to be appropriate. Rather, the arbitrator imposed C.O. Cosman and C.O. Morris be suspended without pay until September 22, 2014 and October 22, 2014, respectively.

5.      The subject incident was also investigated by the Dutchess County District Attorney's Office. In or about March 2016, the Federal Bureau of Investigation and the United States Attorney's Office for the Southern District of New York took over the investigation.

## JURISDICTION AND VENUE

6.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4) and the aforesaid statutory and constitutional provisions.

7.      Plaintiff's claim for attorneys' fees and costs is predicated upon 42 U.S.C. §1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

8.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2), as a

---

[1] Pursuant to DOCCS Directive 2110, "All employees assigned to bargaining units may be suspended without pay prior to the issuance of a Notice of Discipline and during the continuation of disciplinary proceedings if there is probable cause to believe that an employee's continued presence on the job either (1) represents a potential danger to person or property, or (2) would severely interfere with operations. In addition, an employee may be suspended without pay prior to the issuance of a Notice of Discipline and during the continuation of disciplinary proceedings if the employee is charged with the commission of a crime (felony or misdemeanor)."

substantial part of the events or omissions giving rise to this claim occurred within Dutchess County, New York, which is within this judicial district.

## THE PARTIES

9.      At all times alleged herein, Plaintiff was a prisoner confined to the custody and care of the State of New York and its Department of Corrections and Community Supervision ("DOCCS").

10.      At all times alleged herein, Defendant, Anthony J. Annucci, was and remains the Acting Commissioner of the New York State Department of Corrections and Community Supervision, having been appointed by Governor Andrew Cuomo. Commissioner Annucci was and remains the chief executive officer of DOCCS.

11.      As DOCCS Commissioner, Annucci is responsible for the

> superintendence, management and control of the correctional facilities in the department and of the inmates confined therein, and of all matters relating to the government, discipline, [and] policing…concerns thereof. He…[has] the power and it shall be his…duty to inquire into all matters connected with said correctional facilities. He…shall make such rules and regulations, not in conflict with the statutes of this state, for the government of the officers and other employees of the department assigned to said facilities, and in regard to the duties to be performed by them, and for the government and discipline of each correctional facility, as he…may deem proper, and shall cause such rules and regulations to be recorded by the superintendent of the facility, and a copy thereof to be furnished to each employee assigned to the facility…He…shall appoint and remove…subordinate officers and other employees of the department who are assigned to correctional facilities."[2]

Commissioner Annucci also has the duty and power to require reports from all DOCCS superintendents and employees, to inquire into any improper conduct alleged to have been committed by any person at any correctional facility,[3] to require psychological screening of all applicants, to bar and remove the appointment of any person to the position of correction officer

---

[2] New York Correction Law §112(1).
[3] New York Correction Law §112(3).

or supervisor, to require the transfer prisoners for medical diagnoses and treatment to outside hospitals,[4] to require a background investigation of all applicants, to require a thorough investigation to determine the character and fitness of all applicants, to require all new officers to participate in and satisfactorily complete all requirements of a traineeship program before advancing to Correction Officer, and to require all appointees to serve and satisfactorily complete a probationary period before advancing from Trainee to Correction Officer.

12.    At all times alleged herein, Defendant, Ada Perez, was the Superintendent of Downstate Correctional Facility ("DCF"), having been appointed by the commissioner of DOCCS. As Superintendent, Defendant Perez (or "Superintendent Perez") was directly responsible for the supervision and management of DCF[5], including but not limited to directing the work of all officers and subordinates at the facility, defining the duties of all officers and subordinates at the facility, recommending transfer of a prisoner for medical diagnosis and treatment at an outside hospital, enforcing general security policies, and authorizing and managing policies, procedures and customs governing day-to-day security. Additionally, Superintendent Perez was responsible for the assignment and removal of staff, the training of staff, and the supervision of staff and prisoners to ensure a safe environment.

13.    At all times alleged herein, Defendant, Sgt. Scott, was an employee of the State of New York and promoted to the rank of "sergeant" by the commissioner of DOCCS. On November 12, 2013, Sgt. Scott was assigned to DCF Cell Block 1D. As a higher-ranking officer, Sgt. Scott was responsible for the direct supervision of Defendants, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does, on said date; for supervising the custody, security, safety and well-being of Plaintiff and other prisoners at DCF; for supervising the movement and activities

_____

[4] New York Correction Law §§5-8, 22-a, 23.
[5] New York Correction Law §18, 23.

of Plaintiff and other prisoners at DCF; for making periodic rounds of assigned areas; for conducting searches for contraband; for maintaining order within the facility; for preparing reports as necessary; and for advising inmates on the rules and regulations governing the operation of the facility and assist them in resolving problems.

14.     At all times alleged herein, Defendants, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does, were correctional officers assigned to DCF Cell Block 1D on November 12-13, 2013. On said date, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does were under the direct supervision of Sgt. Scott. As correctional officers, said defendants were responsible for the custody, care and control of Plaintiff and other prisoners at DCF; for protecting the security, safety and well-being of Plaintiff and other prisoners at DCF; for supervising the movement and activities of Plaintiff and other prisoners at DCF; for making periodic rounds of assigned areas; for conducting searches for contraband; for maintaining order within the facility; for preparing reports as necessary; and for advising inmates on the rules and regulations governing the operation of the facility and assist them in resolving problems.

15.     At all times alleged herein, Defendants, Pandora A. Volpe, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses, were members of the medical staff assigned to the DCF clinic/infirmary on November 12-13, 2013. Said defendants were responsible for providing competent and thorough professional services in all aspects of Plaintiff's health care on November 12-13, 2013, including but not limited to taking an accurate patient history; performing physical examinations and recording results; ordering blood tests, X-rays and other tests to supplement the examination and assist in evaluating Plaintiff's signs, symptoms and problems; evaluating Plaintiff's condition and making a diagnosis; discussing findings with

Plaintiff and making recommendations; administering treatment and prescribing medications and other treatments to treat Plaintiff's health problems; conducting follow-up examinations and tests to reassess Plaintiff's condition and revise treatment in response to findings; conducting sick call to further evaluate Plaintiff's condition; referring Plaintiff to medical specialists, hospitals, and other treatment providers; assigning, coordinating and supervising the treatment and care of Plaintiff by medical, nursing, patient care and other support staff; and approve the discharge and planning of Plaintiff following the subject use of force.

16.     At all times alleged herein, Defendant, Downstate Correctional Facility Health Services Director John/Jane Doe ("Health Services Director"), was DCF's highest medical authority. Defendant Health Services Director reported directly to Superintendent Perez and indirectly to the regional medical director. Defendant Health Services Director was responsible for supervising the medical staff, all aspects of inmate health care, and scheduling medical coverage. Defendant Health Services Director was responsible for supervising Pandora A. Volpe, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses on November 12-13, 2013. Defendant Health Services Director was responsible for supervising Plaintiff's health care and access to timely and appropriate medical treatment on November 12-13, 2013.

17.     At all times alleged herein, Defendant, Downstate Correctional Facility Deputy Superintendent for Security John/Jane Doe ("Deputy of Security"), was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Defendant Deputy of Security was also responsible for decisions concerning assignment of staff on November 12-13, 2013.

18.     At all times alleged herein, Defendants were entrusted with the custody and care of those persons imprisoned and confined to Downstate Correctional Facility, including but not limited to the Plaintiff.

19.     At all times alleged herein, Defendants, individually and collectively, engaged in the alleged misconduct while acting under the color of law.

20.     At all times alleged herein, Defendants knowingly participated in, acquiesced to, contributed to, encouraged, authorized (either expressly or implicitly), approved, and/or were deliberately indifferent to the misconduct alleged.

## STATEMENT OF FACTS

21.     On or about November 12, 2013, Plaintiff was transferred from Coxsackie Correctional Facility to Downstate Correctional Facility ("DCF") as he had a motion hearing scheduled for the following day in New York County Criminal Court. Plaintiff was scheduled to be picked up on the morning of November 13, 2012 by officers of the New York City Department of Correction for transport to court.

22.     Upon Plaintiff's arrival at DCF as part of an inmate draft, and due to an administrative issue concerning space and cell availability, after the inmates were processed in the reception area, Plaintiff and at least one other drafted prisoner (Tyron Hollmond) were directed to be housed in the mental health unit ("Unit 1D") for that night.

23.     Sgt. Scott, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does (collectively referred to as the "assaulting officers") were all assigned to Unit 1D at that time.

24.     Since Unit 1D was a mental health unit, upon entering Unit 1D, Plaintiff, Mr. Hollmond, and the other prisoners were instructed to remove their shoelaces and belt. Mr. Hollmond then asked one of the assaulting officers why they had to remove their shoelaces and

belt, and he was informed by, upon information and belief, Sgt. Scott and C.O. Santiago that that was the protocol for the mental health unit even though none of the drafted prisoners were designated mental health status and were only assigned to that area due to the lack of cell availability elsewhere.

26.   Thereafter, Plaintiff calmly asked Sgt. Scott, "Ma'am, is this going to affect our status in any way?", as he did not want his status to change to "needing mental health services" as such a designation would require Office of Mental Health staff to screen and evaluate him and he was concerned that could prevent him from appearing at his C.P.L. §440 motion hearing the following morning.

26.   Inexplicably, this innocuous question led an officer, believed to be C.O. Santiago, to grab Plaintiff by the front of his shirt collar and shove him backwards against a table. Plaintiff attempted to defuse this clearly, though unnecessarily, escalating situation by speaking calmly with C.O. Santiago; however, C.O. Santiago struck Plaintiff in the head and face with his baton. Several other officers immediately involved themselves in the situation such that they grasped, manhandled, shoved, and dragged Plaintiff approximately ten feet to the opposite wall and then body slammed him face down into the ground. Plaintiff was then handcuffed.

27.   While on the ground and handcuffed, Sgt. Scott, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does ("the assaulting officers") stomped and kicked Plaintiff in his back, head, face and sides; struck Plaintiff using their batons in his ribs, upper back and feet; and punched Plaintiff in the head, legs, back and ribs.

28.   The assaulting officers then stood Plaintiff up so that C.O. Santiago could punch him cleanly. C.O. Santiago punched Plaintiff directly in his right eye, causing Plaintiff to fall

back to the ground. While he was on the ground, C.O. Santiago picked Plaintiff's head up by his dreadlocks and ripped out a large chunk of Plaintiff's hair, stating, "These are for my bike."

29.     As a result of the subject beating, Plaintiff lost consciousness. The assaulting officers continued to beat Plaintiff while he was unconscious.

30.     During the subject beating, Plaintiff pleaded, "Please Lord stop." The assaulting officers did not stop.

31.     Sgt. Scott, C.O. Santiago, C.O. Cosman, C.O. Morris, and C.O. John Does were all personally involved in the aforesaid beating of Plaintiff. None of these officers intervened to protect Plaintiff despite the beating lasting over five minutes.

32.     Sgt. Scott personally struck Plaintiff and pulled out his hair.

33.     C.O. Santiago personally struck Plaintiff.

34.     C.O. Cosman personally struck Plaintiff.

35.     C.O. Morris personally struck Plaintiff.

36.     Some C.O. John Does personally struck Plaintiff. Other C.O. John Does were present during the beating and failed to intervene or protect Plaintiff. At least one C.O. John Doe was restraining Mr. Hollmond against a wall while the aforesaid officers beat Plaintiff.

37.     None of the assaulting officers or witness officers truthfully reported what they did, saw and heard. Instead, these officers engaged in a cover up in which lies and false accounts were proffered in order to shift blame from the assaulting officers to Plaintiff (falsely claiming that Plaintiff attacked C.O. Cosman).

38.     As a result of the subject beating, Plaintiff sustained a collapsed lung, multiple rib fractures, fractured orbit and cheek bone, internal injuries including fractures of the internal body wall, as well as other injuries and emotional trauma.

39.     Following the subject beating, Plaintiff was maliciously forced to walk to the DCF infirmary as the assaulting officers refused to call for medical assistance. The walk from Unit 1D to the infirmary is extensive and meanders up and down numerous flights of stairs and through long corridors. This was done to cause further injury, pain, suffering, and humiliation to Plaintiff.

40.     At the infirmary, Plaintiff received no treatment whatsoever.

41.     Despite Plaintiff's objectively serious medical condition, Defendants, Pandora Volpe, Health Services Director, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses, on duty that evening failed to provide Plaintiff with any treatment whatsoever.

42.     While at the infirmary, an unknown sergeant (named herein as one of the C.O. John Does though he did not take part in the subject beating), directed Plaintiff to undress and then took photographs of his injuries. Despite Plaintiff's objectively serious medical condition, this sergeant was deliberately indifferent to Plaintiff's immediate medical needs in that he failed to make sure Plaintiff received proper and timely medical treatment and/or transfer to an outside hospital.

43.     A nurse, believed to be Nurse Volpe, then came into the room, saw Plaintiff's condition, and walked out. This nurse then falsely wrote a report in which she falsely stated that Plaintiff was stable and fit for transfer to the Segregated Housing Unit ("SHU"). No physical examination was performed on Plaintiff, Plaintiff's vital signs were not checked, nor was any treatment provided for Plaintiff's difficulty breathing or blood coming from his eye. Plaintiff's visible open wounds were not cleaned or wrapped. Plaintiff was not provided any pain medication. Plaintiff was not taken to the hospital or any emergency care facility.

44.     After spending less than twenty minutes in the infirmary, Plaintiff was forced to walk from the infirmary to SHU in his underwear and socks. The walk from the infirmary to SHU was a challenge, involving at least two long corridors and three flights of stairs. As before, Plaintiff being forced to walk was retaliatory and intended to cause further injury, pain, suffering, and humiliation to Plaintiff.

45.     While in his cell in SHU, Plaintiff requested medical attention from the SHU officer on duty. Said officer called the clinic; however, no medical personnel came to Plaintiff's cell.

46.     Early the following morning, an unknown correction officer delivered a disciplinary infraction notice to Plaintiff, in which Sgt. Scott falsely stated that Plaintiff assaulted C.O. Cosman and C.O. Santiago. Despite seeing Plaintiff in obvious medical distress, this officer failed to request medical attention for Plaintiff.

47.     Later, Plaintiff's blood-soaked clothing (that he was forced to remove in the infirmary so that photographs could be taken of him) was returned to him – washed and clean – in an effort to destroy key evidence.

48.     Several hours later, correction officers from the New York City Department of Correction ("NYC DOC") arrived at DCF to escort Plaintiff to his scheduled motion hearing in New York County Criminal Court. Upon seeing Plaintiff's physical condition and obvious distress (as blood was still pouring out of his fractured eye almost twelve hours later), one of the NYC DOC officers asked a DCF officer what happened to Plaintiff and the DCF officer stated that Plaintiff had fallen down the stairs but was cleared to go to court.

49.     The NYC DOC officers initially refused to take custody of Plaintiff in this condition lest they be blamed for same; however, Plaintiff begged the NYC DOC officers not to

leave him with the DCF officers as they might kill him. Fortunately, the NYC DOC officers agreed to accept Plaintiff if the DCF officer photographed and documented his injuries, which she did.

50.     Plaintiff was taken by NYC DOC officers to Rikers Island, where he was processed and immediately taken to Elmhurst Hospital. At Elmhurst Hospital, Plaintiff was placed on a ventilator due to his collapsed lung. After nearly a week, he was stable enough for transfer to Bellevue Medical Center, where he was admitted for nearly a week and then transferred to the prison ward thereat for several more days. Plaintiff was then discharged to Rikers Island's North Infirmary Command, where he was admitted for a week.

51.     Certainly, Plaintiff's injuries were critical and of an objectively serious nature.

52.     As described above, the defendants subjected Plaintiff to cruel, unusual, inhumane, and degrading treatment.

53.     As described above, the defendants consciously disregarded and were deliberately indifferent to Plaintiff's health, safety, and well-being.

54.     As described above, the defendants consciously disregarded and were deliberately indifferent to Plaintiff's objectively serious medical condition following the subject beating.

55.     At no time prior to using physical force upon Plaintiff did any of the assaulting officers issue any verbal command or warning to Plaintiff, threaten or administer oleoresin capsicum (O.C.) to Plaintiff, or use any other non-physical means of control on Plaintiff.

56.     Instead, the assaulting officers immediately began striking Plaintiff in the head without cause or justification and out of vengeance and malice.

57.     The assaulting officers subjected Plaintiff to unnecessary and wanton infliction of pain.

58.     The assaulting officers' conduct was grossly disproportionate to the severity of the circumstances then and there existing.

59.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to maintain order as Plaintiff was restrained by handcuffs, and was not involved in a fight, posed no threat to the assaulting officers, and did not disregard a lawful order.

60.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to enforce observance of discipline as Plaintiff was handcuffed and did not pose a threat to the assaulting officers, nor did he disregard a lawful order.

61.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to secure or control Plaintiff or the subject location as Plaintiff was handcuffed, and was not involved in a fight, did not pose a threat to the assaulting officers, and did not disregard a lawful order.

62.     At no point during the time period mentioned herein did Plaintiff neglect or refuse an order of a correction officer or violate a directive, rule or regulation of DOCCS.

63.     At no point during the time period mentioned herein did Plaintiff resist or disobey any lawful command of a correction officer.

64.     At no point during the time period mentioned herein did Plaintiff offer violence to any officer or prisoner.

65.     At no point during the time period mentioned herein did Plaintiff injure or attempt to injure DOCCS property.

66.     At no point during the time period mentioned herein did Plaintiff attempt to escape.

67.     At no point during the time period mentioned herein did Plaintiff attempt to lead or take part in a revolt or insurrection.

68.     Following the subject incident, and in attempt to cover up and/or conceal the unlawful conduct complained of herein, the assaulting officers, the infirmary sergeant, the SHU officer, Nurse Volpe, the Health Services Director, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses, acting individually and/or in concert and conspiracy with one another, all intentionally failed to report and/or misrepresented the events leading up to and during the subject incident, each parties' involvement in same, and the injuries and condition of Plaintiff as a result of the beating.

69.     Following the subject incident, and in an attempt to cover up and/or conceal the unlawful conduct complained of herein, the assaulting officers, the infirmary sergeant, the SHU officer, Nurse Volpe, the Health Services Director, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses, acting individually and/or in concert and conspiracy with one another, drafted, executed and filed knowingly false statements and reports wherein these defendants and their supervisors dishonestly stated that Plaintiff posed a danger to officers, others and/or the facility; that Plaintiff refused to obey a lawful order; that Plaintiff caused and/or threatened to cause serious physical injury to an officer or departmental property; and/or these defendants and their supervisors made other knowingly false statements about the incident in

official reports, to investigators, in disciplinary proceedings commenced against them, and in criminal proceedings commenced against them.

70.     As part of said conspiracy and cover-up, these defendants confiscated Plaintiff's bloodied clothing and immediately discarded and/or laundered same so as to remove any evidence of blood, DNA evidence, and other physical evidence.

71.     As part of said conspiracy and cover-up, a Notice of Disciplinary Infraction was issued to Plaintiff. To justify the infraction, the assaulting officers falsely claimed that Plaintiff attacked C.O. Santiago and reasonable force was utilized to gain control of Plaintiff.

72.     As part of said conspiracy and cover-up, the assaulting defendants lied to NYC DOC officers, stating that Plaintiff's injuries were caused when he fell down the stairs.

73.     As part of said conspiracy and cover-up, the assaulting officers, the infirmary sergeant, the SHU officer, Nurse Volpe, the Health Services Director, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses denied Plaintiff access to timely and appropriate medical care and treatment for his objectively serious and critical medical condition.

74.     Defendant Nurse Volpe, a registered nurse, witnessed the severely injured Plaintiff in the infirmary, yet offered no help or assistance. Instead, she remarked sarcastically about the condition of Plaintiff, turned, and walked out of the infirmary.

75.     As a result of the assaulting officers' excessive use of force, Plaintiff suffered physical injuries of an objectively serious and important nature; however, the failures of the defendants to request, authorize, make arrangements and provide transportation for, and/or provide timely and adequate medical care and treatment to Plaintiff caused Plaintiff to

maliciously and gratuitously suffer additional and prolonged pain and suffering and severely threatened Plaintiff's life.

76.     Plaintiff's medical condition was of such gravity that it can be objectively considered a serious medical condition. Defendants, by ignoring his requests for treatment, acted with deliberate indifference. Defendants, by ignoring all available signs that Plaintiff was in physical distress, acted with deliberate indifference.

77.     Defendants, Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, the DCF Health Services Director, and John/Jane Doe infirmary physicians, as well as supervisory officers and the command structure of DOCCS, knew that the pattern of harassment, intimidation, physical abuse, cover-up, and denial of medical care, as described above, existed at Downstate Correctional Facility. These defendants were directly involved in failing to take measures to curb this pattern of brutality. These defendants, by failing to act upon this pattern of brutality, acquiesced in the known unlawful behavior of their correctional and medical staff.  The prevalence of these practices and general knowledge of their existence, and the failure of these defendants to take remedial action despite the fact that the foregoing has been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of all individuals in their custody, and Plaintiff in particular. These Defendants' conduct was a substantial factor in the continuation of such violence and proximate cause of the incident and injuries alleged herein.

78.     DOCCS operates under a system-wide policy. With only some exceptions, DOCCS trains all of its correctional officers at a single Training Academy according to a uniform curriculum; maintains a centralized Investigation Division to investigate allegations such as those contained herein under uniform procedures; and maintains a centralized unit to

conduct administrative prosecutions (or to decline to prosecute or to plea bargain) in those few instances where the DOCCS substantiates the allegation(s).

79.     Defendants, Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, the DCF Health Services Director and John/Jane Doe infirmary physicians, as well as supervisory officers and the command structure of DOCCS have consistently failed to investigate allegations such as those contained herein and to discipline officers and medical staff who have violated DOCCS directives, guidelines, and/or the law. In the rare instance where an investigation does occur, these investigations are routinely clouded by a bias in favor of correctional officers and medical staff and against prisoners. Furthermore, officers and medical staff who are known to have violated an individual's civil rights in one prison or command are often transferred by DOCCS to another prison or command rather than be disciplined, demoted, or terminated by DOCCS, thereby allowing the violence and other abuses to continue.

80.     As set forth above, the subject incidents, as well as the assaulting officers and medical staff on duty who ignored, acquiesced, joined and/or were complicit in same, constituted an unnecessary, unreasonable, and excessive use of force.

81.     On each occasion claimed herein, Defendants acted with deliberate indifference to the Plaintiff's safety, security, health, and immediate medical needs.

82.     As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's objectively serious medical conditions, Plaintiff's resulting physical, psychological and emotional injuries, pain and suffering were gratuitously and maliciously exacerbated and his recovery compromised.

83.    As set forth above, Defendants have made every effort to conceal the truth above what actually occurred, including but not limited to covering up, or attempting to cover up, the illegal conduct complained of herein.

84.    The aforesaid acts and omissions violated the Plaintiff's clearly established civil rights secured by the United States Constitution and were the direct and proximate cause of the physical, psychological, and emotional injuries he suffered.

85.    The defendants actions were malicious in the instance and served no legitimate penological interest.

### AS AND FOR HIS FIRST CLAIM
#### 42 U.S.C. §1983
Violation of Plaintiff's Constitutional Rights by Defendants Sgt. Scott, C.O. Santiago, C.O. Cosman, C.O. Morris and C.O. John Does
_____

86.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "85" of this Complaint, inclusive, as though more fully set forth herein.

87.    As set forth above, Defendants Sgt. Scott, C.O. Santiago, C.O. Cosman, C.O. Morris and C.O. John Does ("the assaulting officers"), acting under color of law, did intimidate, assault, batter, and use excessive physical force on Plaintiff without legal cause or justification and with the purposeful and malicious intent to cause harm to Plaintiff.

88.    The assaulting officers used force on Plaintiff as punishment, and did retaliate against Plaintiff for exercising his First Amendment rights.

89.    As set forth above, the assaulting officers, acting under color of law, did deny Plaintiff access to timely, appropriate and necessary medical care, were deliberately indifferent to Plaintiff's objectively serious medical condition and needs following the subject beating, were deliberately indifferent to excessive risks to Plaintiff's health or safety, and did gratuitously force

Plaintiff to walk from the location of the beating to the infirmary and then the SHU cell with a malicious intent to cause Plaintiff further pain and suffering.

90.    The assaulting officers did take specific and intentional action to cover-up their unlawful conduct, including but not limited to conspiring to create a false narrative of what transpired, knowingly drafting and filing false official reports, giving false sworn testimony to superiors, investigators and prosecutors, failing to report the incident to local, state and/or federal authorities, destroying physical evidence, preventing Plaintiff from receiving timely and necessary medical care and treatment, and preventing others from truthfully documenting and/or photographing Plaintiff's injuries.

91.    The aforesaid misconduct was part of a widespread practice at DCF that, although not expressly authorized, constituted a custom or usage of which the assaulting officers' superiors were aware.

92.    As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

### AS AND FOR HIS SECOND CLAIM
#### 42 U.S.C. §1983
Violation of Plaintiff's Constitutional Rights by Defendant Pandora Volpe, R.N.

_____

93.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "92" of this Complaint, inclusive, as though more fully set forth herein.

94.    As set forth above, Defendant Nurse Volpe, acting under color of law, was deliberately indifferent to Plaintiff's objectively serious medical condition following the beating in that she failed to examine and treat Plaintiff upon his presentation to the infirmary despite the fact that (a) his right eye was incredibly swollen, red and had blood pouring out of it; (b) it would be readily apparent to a layperson that Plaintiff had difficulty breathing and was exhibiting other

symptoms of a collapsed lung; (c) Plaintiff had numerous bruises, scratches and abrasions all over his body; and (d) Plaintiff was missing a large section of his hair due to it being ripped from his scalp.

95.      Additionally, Defendant Nurse Volpe, acting under color of law, was deliberately indifferent to Plaintiff's objectively serious medical condition following the beating in that she only gave a cursory, superficial and fleeting visual check of Plaintiff when he was brought into the infirmary before approving him as fit for transfer to SHU; failed and/or refused to examine Plaintiff in his SHU cell upon request of the SHU officer on duty; was criminally reckless in the instance; and otherwise failed to act in the instance despite being actually aware of a substantial risk that serious harm will come of Plaintiff due to her failure to act.

96.      By virtue of her licensing and training, Defendant Nurse Volpe was consciously aware of the serious nature of Plaintiff's injuries and did ignore, refuse, deny and/or delay Plaintiff's requests for medical care and treatment; was complicit in and/or direct participant in the cover-up of the subject beating; did knowingly draft and file false medical and injury reports and/or gave false sworn statements in an effort to cover-up evidence of the assaulting defendants' excessive use of force and other misconduct; did fail to report what she saw and heard to local, state and/or federal authorities; destroyed physical evidence; prevented Plaintiff from receiving timely and necessary medical care and treatment; prevented others from truthfully documenting and/or photographing Plaintiff's injuries; and was otherwise deliberately indifferent as set forth above.

97.      The aforesaid misconduct was part of a widespread practice at DCF that, although not expressly authorized, constituted a custom or usage of which Nurse Volpe's superiors were aware.

98.     The conduct of Nurse Volpe in the instance was so grossly incompetent, inadequate, and excessive so as to shock the conscience, and was so intolerable to fundamental fairness, and was maliciously and sadistically used to cause further harm to Plaintiff.

99.     Nurse Volpe was part of an entrenched culture of violence and deliberate indifference to medical needs by officers and healthcare workers towards prisoners, of which her immediate supervisors as well as DCF and DOCCS administrators were aware, including but not limited to Defendants, Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, and the Health Services Director.

100.    Nurse Volpe has been involved in similar incidents prior to November 12, 2013, for which no corrective action had been taken against her, including but not limited to the incident involving Mr. Parker described below.

101.    As a result of the foregoing, said defendant deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

### AS AND FOR HIS THIRD CLAIM
### 42 U.S.C. §1983
Violation of Plaintiff's Constitutional Rights by the Health Services Director, John/Jane Doe
Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators,
John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses

_____

102.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "101" of this Complaint, inclusive, as though more fully set forth herein.

103.    Defendants, Health Services Director, John/Jane Doe Physicians, John/Jane Doe Physician Assistants, John/Jane Doe Nurse Administrators, John/Jane Doe Nurse Practitioners, and John/Jane Doe Nurses, were on duty at the time of the incident and for the relevant time period thereafter and were personally involved in the failure to provide Plaintiff with medical care or treatment.

104.     While acting under color of law, these defendants were deliberately indifferent to Plaintiff's objectively serious medical condition following the beating in that they failed to examine and treat Plaintiff upon his presentation to the infirmary despite the fact that his right eye was incredibly swollen, red and had blood pouring out of it; it being readily apparent that Plaintiff had difficulty breathing and was exhibiting other symptoms of a collapsed lung; Plaintiff having numerous bruises, scratches and abrasions all over his body; Plaintiff missing a large section of his hair due to it being ripped from his scalp; in failing to interview or examine Plaintiff when he was brought into the infirmary before approving him as fit for transfer to SHU; in failing and/or refusing to examine Plaintiff in his SHU cell upon request of the SHU officer on duty; in being criminally reckless in the instance; and in otherwise failing to act in the instance despite being actually aware of a substantial risk that serious harm will come of Plaintiff due to their failure to act.

105.     By virtue of their licensing and training, these defendants were consciously aware of the serious nature of Plaintiff's injuries and did ignore, refuse, deny and/or delay Plaintiff's requests for medical care and treatment; were complicit in and/or direct participant in the cover-up of the subject beating; did knowingly draft and file false medical and injury reports and/or gave false sworn statements in an effort to cover-up evidence of the assaulting defendants' excessive use of force and other misconduct; did fail to report what they saw and heard to local, state and/or federal authorities; destroyed physical evidence; prevented Plaintiff from receiving timely and necessary medical care and treatment; prevented others from truthfully documenting and/or photographing Plaintiff's injuries; and were otherwise deliberately indifferent as set forth above.

106.    The aforesaid misconduct was part of a widespread practice at DCF that, although not expressly authorized, constituted a custom or usage of which these defendants' superiors were aware.

107.    The conduct of these defendants in the instance was so grossly incompetent, inadequate, and excessive as to shock the conscience, and was so intolerable to fundamental fairness, and was maliciously and sadistically used to cause further harm to Plaintiff.

108.    These defendants were part of an entrenched culture of violence and deliberate indifference to medical needs by officers and healthcare workers towards prisoners, of which their immediate supervisors as well as DCF and DOCCS administrators were aware, including but not limited to Defendants, Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, and the Health Services Director

109.    Upon information and belief, these defendants have all been involved in similar incidents prior to November 12, 2013, for which no corrective action had been taken against them.

110.    As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

**AS AND FOR HIS FOURTH CLAIM**
**42 U.S.C. §1983**
Violation of Plaintiff's Constitutional Rights by Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, and the Health Services Director

———————————————————

111.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "110" of this Complaint, inclusive, as though more fully set forth herein.

112.    Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, and the Health Services Director are senior officials endowed and bestowed by DOCCS with policy-

making and decision-making authority.

113.   These defendants allowed unconstitutional policies, customs and practices to occur at DCF and/or allowed the continuance of such policies, customs and practices, including but not limited to excessive uses of force by staff, cover-ups of staff misconduct, submissions of false and/or misleading official reports by staff, denial and delays of medical care and treatment to prisoners, perfunctory medical examinations of injured prisoners, destruction of physical evidence, and grossly inadequate training, supervision, retention and counseling of correctional officers and medical staff.

114.   The assaulting officers were part of an entrenched culture of violence and deliberate indifference to medical needs by officers and healthcare workers towards prisoners, of which their immediate supervisors as well as DCF and DOCCS administrators were aware, including but not limited to Defendants, Commissioner Annucci, Superintendent Perez, the DCF Deputy of Security, and the Health Services Director.

115.   The assaulting officers have all been involved in similar excessive use of force incidents prior to November 12, 2013, for which no corrective action had been taken against them.

116.   In fact, just two months prior to the subject incident, on or about September 10, 2013, Sgt. Scott, C.O. Santiago and other officers beat a shackled prisoner named Archie Singletary so badly that he sustained a fractured cheek bone and bruising all over his body. Similar to their "care" of Plaintiff after beating him, Mr. Singletary was dragged to the infirmary and cleared for transfer to SHU. While at SHU, Mr. Singletary complained of difficulty breathing; however, that only prompted the officers to beat him again as they took him back to the infirmary. Mr. Singletary filed a federal action against these officers.

117.    A month prior to beating Mr. Singletary, on or about August 6, 2013, Sgt. Scott, C.O. Santiago and other officers beat a prisoner named Keenan Parker, during which C.O. Santiago purposely jerked and twisted Mr. Parker's left foot with the intent to fracture his ankle, which he did. Sgt. Scott watched idly as C.O. Santiago and other officers beat Mr. Parker. Sgt. Scott and C.O. Santiago then attempted to cover-up this beating by failing to follow DOCCS directives and procedures following uses of force, including but not limited to videotaping all escorts of prisoners to the infirmary and photographing injuries. Following this beating, Mr. Parker was taken to the infirmary, where medical and correctional staff thereat, including Defendant Nurse Volpe, refused to document or examine Mr. Parker's injuries. Nurse Volpe was deliberately indifferent to Mr. Parker's serious medical condition in that she failed to examine Mr. Parker's fractured ankle/foot or refer him to a hospital for care, failed to stitch his open wounds, and failed to provide pain medication.

118.    Upon information and belief, C.O. Santiago also used excessive physical force upon a prisoner named Gamaro Tallegrano on September 11, 2013 – <u>one day after</u> he beat Mr. Singletary so profoundly.

119.    Despite these prior incidents involving the same officers, together with prior reports and recommendations issued both internally and externally, including but not limited to a 2009 report by the Correctional Association of New York ("CANY"), these defendants persistently failed to adopt any policy or practice, or modify any policy or practice (or the enforcement thereof), or faithfully investigate the circumstances in which a prisoner suffered a serious or questionable injury, with the goal to mitigate, eliminate and deter excessive uses of force by officers on prisoners and denial of medical care by correctional staff and infirmary

personnel.[6]

120.    These defendants also failed to adopt any policy or practice, or modify any policy or practice (or the enforcement thereof), or faithfully investigate the reason DCF's work cadre prisoners are treated substantially better than its reception prisoners[7], despite CANY's 2009 report identifying key differences between these two types of inmates when it comes to staff relations (e.g. physical abuse, verbal harassment, false disciplinary tickets, retaliation for complaints/grievances, threats, intimidation, etc.) and provision of medical care and CANY's recommendation that this be evaluated. To wit, CANY's 2009 report found that (a) only 4% of work cadre prisoners reported experiencing a physical confrontation with DCF staff, compared to 21% of reception prisoners[9]; (b) 21% of work cadre prisoners reported feeling unsafe at DCF, compared to 41% of reception inmates; (c) 54% of work cadre inmates reported experiencing verbal harassment from staff "frequently," compared to 79% of reception inmates; and (d) 9% of work cadre prisoners reported that staff had shut off the lights or water in their cells as a form of harassment, compared to 27% of reception inmates.

121.    CANY's 2009 report also found that most physical confrontations between staff and inmates occurred during the 3:00 p.m. to 11:00 p.m. shift, with 56% of cadre inmates reporting that physical confrontations most often occurred in the reception draft processing area. With this information, these defendants could easily have (a) determined which officers were assigned to the reception draft processing area during the 3:00 to 11:00 p.m. shift, cross-referenced those names with prisoner claims of excessive force and lawsuits, and then initiated an investigation into said officers and staffing problems, (b) thoroughly scrutinized these

---

[6] 80% of the work cadre prisoners and 61% of the reception prisoners surveyed by CANY said the administration at DCF "does very little or nothing to prevent abuse…"

[7] As Plaintiff was on a draft from Coxsackie Correctional Facility, he was considered a reception/transit inmate.

[9] Incredibly, 11% of reception prisoners surveyed reported having a physical confrontation with another inmate at least once at DCF; however, nearly twice that amount (21%) reported having a physical confrontation with staff.

officers' use of force reports, (c) thoroughly scrutinized prisoners' complaints about these officers, (d) thoroughly scrutinized reception prisoners' injuries and/or injured prisoners arriving to the infirmary from the reception area between 3:00 p.m. and 11:00 p.m., (e) restructured officer post assignments, work details, and office groupings so the officers involved in the highest incidence of uses of force will not be assigned the same tour, and (f) installed video cameras in the subject location to deter violence. However, these defendants did none of these things.

122.    Additionally, CANY's 2009 report found DCF's infirmary to be operating substantially below capacity, having a capacity to accommodate 14 inmates yet the average daily infirmary population was between 8-10 inmates. Despite operating below capacity, DCF reception inmates experience far more delays than cadre inmates when it comes to receiving care from the doctors, physician assistants and nurse practitioners in the infirmary, with their median wait time being 11 days compared to cadre inmates waiting one day. CANY's 2009 report stated "…there is no apparent reason that there should be such a difference in wait time for reception inmates." In addition to these delays, inmates also reported "perfunctory examinations and that the quality of encounters varied depending on the clinician."

123.    Further demonstrating these defendants creating and/or allowing an institutional policy or practice of disparate, heavy-handed treatment of reception/transit inmates compared to work cadre inmates is the amount of grievances filed by each type of prisoner. CANY's 2009 report cites 54 grievances filed by DCF's work cadre inmates in 2009, a decrease from 57 in 2008, with the most highly grieved issues concerning medical services (11) and staff conduct (9). In contrast, DCF's reception inmates filed 478 grievances in 2009, an increase from 459 in 2008, with staff conduct (72 grievances) comprising 15% of all reception inmate grievances filed that

year and medical services (49 grievances) comprising more than 10% of reception inmate grievances filed that year.

124.    With regard to DCF's Special Housing Unit, where Plaintiff was taken after the infirmary, CANY's 2009 report found that "[p]hysical assault, verbal and racial harassment, and threats and intimidation [by staff] were common forms of abuse reported by SHU survey respondents."

125.    In concluding its report, CANY made the following non-exhaustive list of recommendations:

- Examine the successful sick-call and medical call-out procedures for cadre inmates and devise similar procedures for the reception population.

- Ensure that all inmates scheduled for a clinic call-out are promptly seen in accordance with their medical needs.

- Enhance the medical screening process to make sure that detailed medical histories are obtained on all inmates, including asking if they have any chronic medical conditions or any need for immediate medical or mental health care, and to discuss all medical test results with inmates.

- Assess the level and causes of tension between staff and inmates within the reception area and develop a plan to reduce tension and incidents of verbal harassment, including diversity training for staff and inmates.

- Meet with the ILC (Inmate Liaison Committee) and IGRC (Inmate Greivance Resolution Committee) to discuss ways to reduce tension in the reception area.

126.    Despite CANY's 2009 report and recommendations, these defendants failed to develop policies and practices adequate to deter officer on prisoner violence; failed to cure the systemic disparity of care between work cadre inmates and reception/transit inmates; failed to faithfully investigate officers with a history of grievances made against them for excessive uses of force and take corrective action; failed to faithfully investigate medical personnel with a history of grievances made against them for excessive uses of force and take corrective action;

failed to reorganize certain officers' schedules so they could not work the same shift and location together; failed to develop policies and practices adequate to train, supervise, retain and counsel correctional officers in how and when to use force appropriately, the quantum of force to be applied, truthful and complete reporting of all incidents, making medical care available to prisoners, and peacefully interacting with and gaining compliance from prisoners; failed to develop policies and practices adequate to train, supervise, retain and counsel medical personnel in the truthful and complete reporting of all incidents, making medical care available to prisoners, and peacefully interacting with and gaining compliance from prisoners; continued to accept medical reports and unusual incident reports that they knew or should have known contained false, incomplete and/or misleading statements and conclusions by staff and supervisory personnel in an effort to cover up evidence of their subordinate's unlawful activities; failed to implement recommendations of training, re-training, suspension, and/or termination of employment where appropriate; and were otherwise deliberately indifferent to the safety, security and health of inmates confined to DCF.

127.    The totality of similar incidents at DCF during the tenure of these defendants and their predecessors indicates that, given their supervisory duties and security responsibilities, these defendants were grossly negligent in their training, supervision, and retention of DCF's officers and medical personnel, including but not limited to the individuals involved in the subject incident; in failing to act upon information indicating that unconstitutional acts were occurring; in failing and/or refusing to investigate staff on prisoner abuse at DCF and the officers and medical personnel involved; and in failing to adopt policies and procedures that would have prevented the abuses alleged herein.

128.    These defendants failed to perform their statutory and/or stated responsibilities in

that they knew or should have known that the pattern of abuse set forth herein existed at DCF and its infirmary clinic. Their failure to take measures to curb this pattern of brutality, cover-up, and denial of medical care constitutes acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence, and the failure of these defendants to take remedial action despite the fact it has been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the prisoners in their care and custody, including the plaintiff. These defendants' refusal and/or failure to act and/or acquiescence to the misconduct alleged herein has been a substantial factor in the constitutional violations suffered by Plaintiff.

129.    Additionally, in an attempt to cover-up the misconduct of their subordinate staff, these defendants failed to notify local, State, and/or Federal authorities as required by law.

130.    As set forth herein, these defendants and their predecessors and subordinates have had, and continue to have, a custom and practice of deliberate delay and avoidance in investigating allegations of abuse and other misconduct by their officers and medical personnel, to the direct detriment of Plaintiff.

131.    Prior to November 2013, these defendants and their predecessors developed and maintained customs, policies, usages, practices, procedures, and rules that resulted in (a) the deprivation of Plaintiff's Eighth Amendment rights; (b) uses of force in an unreasonable, unnecessary, unjustified, excessive, retaliatory, and punitive manner; (c) inadequate instruction and supervision of officers and healthcare workers, and their supervisors, in the proper and appropriate care and treatment of prisoners in their custody and control; (d) inadequate instruction and supervision of officers and healthcare workers, and their supervisors, in communicating with, understanding, and gaining compliance from prisoners; (e) inadequate

training, re-training, and supervision of staff in the use of force, avoidance of force, truthful reporting of incidents, duty to protect and intervene, and drafting and maintaining complete and truthful use-of-force, injury, and medical reports; (f) inadequate investigation into prisoner grievances/complaints of staff harassment, intimidation, misconduct, excessive use of force, abuse, discrimination, denial and/or delay of medical care, and other misconduct, and in the inadequate punishment of the subjects of those complaints that were substantiated; (g) tolerating acts of brutality and indifference; (h) tolerating acts of retaliation against a prisoner making a complaint against staff; (i) covering-up and/or insulating staff who engage in criminal or other serious official misconduct from detection, prosecution, and/or punishment; and (j) tolerating staff who engage in a pattern and practice of actively and passively covering up misconduct by fellow officers and medical personnel, thereby establishing and perpetuating a "code of silence."

132.    The failures of these defendants to take any action to curb the abuses of their subordinate personnel, despite having received extensive information concerning the pattern of incidents involving violence and denial of medical care by the assaulting officers, Nurse Volpe, and other correctional officers and medical personnel on duty, was the moving force behind the constitutional violations suffered by Plaintiff.

133.    These defendants not only overlook the type of oppressive, forceful acts alleged herein, but implicitly encourage it as a prisoner management tool. These defendants have a longstanding history of tolerating and authorizing the type of abusive practices alleged herein.

134.    Through promotions and other financial and status incentives, these defendants have the power to reward officers and healthcare workers who perform their jobs adequately and to punish – or at the very least fail to reward – those who do not. These defendants' repeated failures to punish staff and supervisors who violate prisoners' constitutional and/or statutory

rights have created and maintained the perception amongst staff and supervisors that harassment, intimidation, excessive use of force, discriminatory conduct, cover-up, medical neglect, and/or such other misconduct will not lead to investigation, punishment or detriment to one's career or even financial penalty. This pattern of unchecked abuse, and the breadth with which these unlawful practices have been adopted by significant numbers of staff and supervisors, and the persistent failure or refusal of these defendants to train, re-train and supervise these persons properly, demonstrates a policy of deliberate indifference towards the misconduct claimed by Plaintiff and was the moving force behind the constitutional violations suffered by the plaintiff.

135.    As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

## AS AND FOR HIS FIFTH CLAIM
### 42 U.S.C. §1983
Conspiracy to Cover-Up the Subject Incident by All Defendants

_____

136.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "135" of this Complaint, inclusive, as though more fully set forth herein.

137.    As set forth above, the defendants, all acting under the color of law, willfully conspired with one another to deprive Plaintiff of his constitutional rights, including but not limited to his right to be free from cruel and unusual punishment; to be free from the use of unreasonable and/or excessive force; to be free from unreasonable delay and/or denial of medical care; to be free from harassment and intimidation; to be free from reprisal for exercising his First Amendment rights; to be free from malicious and retaliatory attacks; to be free from conduct intended to chill his speech; to be free from false and subversive statements and proceedings designed to cover up the misconduct of others; to equal protection of the law; to equal privilege

and immunities under the law; to associate and speak freely; and to have access to and seek redress in the courts.

138.     In complicity with said conspiracy, each defendant, acting in their own self-interest to avoid criminal prosecution, civil liability and/or employment-related disciplinary proceedings, did submit a false report and/or statement to support and corroborate the fabricated allegations lodged against Plaintiff, or was aware that a subordinate or peer submitted a false report and/or statement and failed to report same.

139.     As a result of said conspiracy and/or the defendants' furtherance of the conspiracy, Plaintiff has been injured and deprived of the rights and privileges afforded by the Constitution of the United States of America.

140.     Defendants had knowledge that a 42 U.S.C. §1983 conspiracy was in progress, had the power to prevent or aid in preventing the conspiracy from continuing, and neglected or refused to do so.

141.     With due diligence, the defendants could have promptly reported the subject events to superiors and to duly authorized investigators. Their failure to do so allowed the conspiracy to continue, evidence to be destroyed, and the truth suppressed.

142.     Had said defendants complied with the law and furnished truthful information to authorities about their conduct and/or Plaintiff's conduct, the conspiracy would not have succeeded to the extent that it did.

143.     As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

## <u>RELIEF</u>

Plaintiff requests compensatory damages against all defendants in an amount to be determined at trial, punitive damages against all defendants in an amount to be determined at trial, reasonable attorney's fees, costs and disbursements pursuant to law, and such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      June 21, 2016

                                      Yours, etc.,

                                      **HELD & HINES, L.L.P.**

                                  _____/s/_____
                                    By: Philip M. Hines, Esq.
                                    *Attorneys for Plaintiff*
                                    2004 Ralph Avenue
                                    Brooklyn, New York 11234
                                    (718) 531-9700
                                    phines@heldhines.com

## **ATTORNEY VERIFICATION**

PHILIP M. HINES, an attorney duly licensed to practice in the courts of the State of New York, hereby affirms the following under penalties of perjury:

I am a member of the law firm of HELD & HINES, LLP, attorneys for the plaintiff, Kevin Moore, in the within action. I have read the foregoing Verified Complaint and know the contents thereof; that same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe them to be true. The reason this Verification is made by me and not by the plaintiff is that Plaintiff resides outside of the County in which the Affirmant's office is located.

The grounds of my belief as to all matters stated upon my own knowledge are as follows: the records, reports, and documents contained in the plaintiff's file.

_____/s/_____
PHILIP M. HINES, ESQ.

Affirmed to this 21st
day of June, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
KEVIN MOORE,

                                           Docket No.

                        Plaintiff,

     -against-

ANTHONY J. ANNUCCI, et al.,

                        Defendants.

-------------------------------------------------------------------------X


**VERIFIED COMPLAINT**


**HELD & HINES, LLP**
**Attorneys for Plaintiff(s)**
**Office & Post Office Address**
**2004 Ralph Avenue**
**Brooklyn, New York 11234**
**(718) 531-9700**


**Signature (Rule 130-1.1-a)**


_____/s/_____
**PHILIP M. HINES, ESQ.**